RIGGE *v.* WICKES BROS.

MASTER AND SERVANT—COMPETENT EMPLOYÉS — FOREIGN LABORERS—IGNORANCE OF ENGLISH.

No sufficient evidence of negligence was offered, in a personal injury action, brought on the theory that defendant owed a duty to its servant to provide laborers competent to assist in erecting a boiler front, but hired Italians and other foreigners to assist the injured employé, with the result that they

misunderstood his orders and allowed a heavy steel boiler front to fall upon him, where the only testimony that the laborers did not understand English was the conclusion of the injured servant, based either on hearsay or his deduction from their failure to follow his directions.[1]

Error to Saginaw; Gage, J. Submitted February 16,. 1911. ( Docket No. 71.) Decided March 31, 1911.

Case by Edward G. Rigge against Wickes Brothers, a domestic corporation, for personal injuries. Emma Rigge, administratrix of plaintiff's estate, was substituted as plaintiff after the decease of intestate. A judgment for defendant, on a verdict directed by the court, is reviewed. by plaintiff on writ of error. Affirmed.

*Fred L. Travers* (*De Vere Hall*, of counsel), for appel- lant.

*Keena, Lightner & Oxtoby* (*Weadock & Weadock*, of counsel), for appellee.

HOOKER, J. Defendant, a Michigan corporation, en- gaged in building steam boilers and erecting steam plants about the country, employed Gustav Rigge to superintend such erection, and plaintiff's husband, Edward Rigge, had worked for defendant with or under Gustav Rigge, his father, for some nine or ten years, but had left such employ apparently on account of some misunderstanding between himself and father, or possibly between himself and defendant. He and his father were both masons by trade. Being sent to Milwaukee to erect a plant of three boilers, the father, who had authority to employ such help as he needed, telegraphed Edward, who was then at Ludington, as follows :

" Edward Rigge, 209 Second St., Ludington, Michigan. Arthur and I leave 7 a. m. for Milwaukee via Luding- ton. Be at depot. You're to go along by order L. B.

---

[1]As to the master's duty with respect to employment of servants generally, see note in 48 L. R. A. 369.

Gustav Rigge. 8:10 a. m. 24th. Saginaw, Michigan, August 23, 1906."

"L. B." meant L. Baker, who was the superintendent of defendant's business at Saginaw. Arthur was another son of Gustav Rigge, about 15 years of age. Edward testified that he was an apprentice. Edward also testified that he was employed as a mason to do mason work, but admitted that he was competent to and knew how to do the work in which he was engaged when injured, of which his father had general charge. This consisted in setting in proper place the sheet or plate steel boiler fronts which form the face of the boilers where the doors are. They are backed up by a brick wall, and have to be set in proper position before the wall is built. This front was about nine feet high by eleven feet long, a flat piece of steel from a quarter to a half inch thick, and weighed about twelve hundred pounds. This boiler front had been unloaded from a freight car just before the accident to Edward Rigge. It was done by hand, under the direction of Gustav Rigge, Edward, Arthur, and several laborers employed by Gustav, assisting, and had been raised up and stood on edge in front of the boiler held by the laborers. It had to be moved forward, and Edward was endeavoring to raise it up with a pinch bar while it was being held at the time by the laborers, when it fell upon and injured him. He returned to Michigan, and brought an action to recover damages for injuries sustained, ascribing them to the neglect of defendant, in that it neglected to send from its factory in Saginaw competent and experienced "riggers" to erect and place said front in position, in directing and requiring plaintiff to assist in erecting and placing said front in position, and to perform duties outside his contract of hiring, and in failing to supply experienced laborers familiar with plaintiff's language to assist him in said work, and asserting that the injury was occasioned by a misunderstanding of the orders given. Subsequently the original plaintiff, Edward Rigge, died, and the cause was revived by the suggestion of the

death and appearance of his administratrix. Upon the trial a verdict was directed in favor of the defendant on two grounds:

*First.* That the action brought was a common-law action, that as it occurred in Wisconsin, and, in the absence of an allegation that under the statutes of Wisconsin it survived to plaintiff's representatives, the contrary would be assumed, and the suit abated on the death of the plaintiff.

*Second.* That the accident was caused by the negligence of fellow-servants.

Plaintiff has appealed.

The negligence relied on is that the defendant's foreman procured laborers to aid in raising and holding the fire front who were foreigners, and were not able to understand the English language, and, when ordered by Edward to hold on, they let go of the fire front, or shoved it over, and it fell. An examination of the testimony shows that the fire front was a plate of steel from a quarter to a half inch thick, weighing from 1,000 to 1,200 pounds. It was to stand and be fastened in front of the boiler at a proper distance, preparatory to bricking in. The deceased was voluntarily bossing the job in the temporary absence and at the request of his father, which he understood and was competent to do. He had ten or a dozen common laborers to aid in raising, placing in proper position and holding the same, while he should make it fast with some scantling which he had prepared for the purpose. They had lifted the upper side, and the plate stood perpendicular, being held by the laborers. It was necessary that it be moved bodily forward about two inches.

We will quote the testimony with a view to ascertaining what there is justifying plaintiff's claim that the laborers could not understand the English language. Edward Rigge's deposition was read. The deposition of the deceased and the testimony of his brother Arthur tend to show that during the forenoon the Rigges, aided by from

10 to 15 common laborers, mostly if not all foreigners, built runs and unloaded this fire front and moved it to its place in front of the boiler, and placed it on the ground with the bottom edge next the boiler. Edward Rigge had some clamps made of scantling, intended to secure the front when it should have been placed in position. After dinner the men assembled, apparently being all or most of those who had worked in the morning, and perhaps some others. Acting under the management of Edward, they raised the outer edge, bringing the plate to a perpendicular position in front of the boiler, and stood holding it there. Up to this point the orders, if any upon which the men acted, are not shown. It then became necessary to move this plate bodily forward two inches or thereabouts, and this was attempted; plaintiff being directly in front of the same. Nothing clearly shows that the men were told of this intention, or that the deceased gave any direction until the instant before it fell, though they apparently understood it. As he attempted to move the plate by using pinch bars under the lower edge, as he says to get a roller under it, he gave an order to them, according to his testimony.

"*Q.* What did you tell them to do first before you got hurt?

"*A.* 'Hold on there, now.' They were holding onto the fire front, and, when I said that, I was in front of it.

"*Q.* What did the Italians do then?

"*A.* They shoved it over; let go of it.

"*Q.* Did you tell them to let go?

"*A.* No, sir.

"*Q.* And what happened to it?

"*A.* It fell onto me; fell over to the front.

"*Q.* Now, what did they do when they let go?

"*A.* That is something I couldn't say.

"*Q.* Did you see where they went?

"*A.* I was unconscious. The front was right on top of me.

"*Q.* Did you know up to that time that they didn't understand your language?

"*A.* No, sir. * * *

"*A.* No, sir. They had been at work with us about four or five hours.

"*Q.* Five hours; during that time were they working under your direction?

"*A.* No, sir. They were working under the direction of my father.

"*Q.* Did you have any occasion to talk with them in any way?

"*A.* To those helpers?

"*Q.* To those helpers.

"*A.* Yes, sir.

"*Q.* What were the nationalities of those helpers?

"*A.* To the best of my judgment they were Italian, but they may have been other foreign language. I couldn't understand what they said, their language.

"*Q.* You say during all the time that they were working there with you, you didn't have occasion at any time to talk with any of those helpers or give them any instructions or any orders?

"*A.* That I didn't have any occasion?

"*Q.* Yes, sir.

"*A.* No, sir. Just a minute. That I had occasion to talk to those men?

"*Q.* Yes, sir.

"*A.* Yes; I did.

"*Q.* Did you know at the time you spoke to them that they couldn't understand the English language?

"*A.* No, sir.

"*Q.* Could they understand English?

"*A.* I don't know. I didn't know it till after. I know they couldn't now.

"*Q.* Didn't know until after the accident, Mr. Rigge, that those men couldn't talk English? Then you had occasion, you say, to have conversation with them before the accident happened?

"*A.* That is right.

"*Q.* That is correct, is it?

"*A.* I didn't know; no. That is the question?

"*Q.* No. You say you had conversation with those helpers before this accident occurred. They had been with you some four or five hours. You claim, now, not to have known that they couldn't talk English until after you were hurt?

"*A.* Yes, sir.

"*Q.* You want us to understand that?

"*A.* I want you to understand I didn't understand that they couldn't talk English until after I was hurt. I don't remember whether I heard them converse among themselves. * * *

"*Q.* Well, you and your brother were pinching along this fire front, weren't you, with a pinch bar?

"*A.* Yes, sir. I don't know that my brother was pinching anything. He was there. He was an apprentice.

"*Q.* Who was giving orders to the apprentices and to the helpers while you were doing that work?

"*A.* Who was giving them to them?

"*Q.* Yes, sir.

"*A.* All I told them was 'to hold onto it now.' This fire front was up. I said: 'Hold on! Hold her! Hold it, now!' And I couldn't step to see in front, and I started to lift on this, and over it came.

"*Q.* They let go, instead of holding on to it?

"*A.* Yes. Or they shoved. Before this accident happened, we were not pinching this fire front along just the same for some few minutes. We had just started. I don't know exactly how long my father had been absent from this work before my brother Arthur and I attempted to pinch the fire front along. * * *

"*Q.* And so the whole thing, the pinching over of that front was right under your direction? You were overseeing it as it was?

"*A.* Overseeing it?

"*Q.* Yes; you were the one that was going to pinch it over and then give the order to quit?

"*A.* Yes, sir.

"*Q.* Sir?

"*A.* We wanted to get it pinched while my father was away."

Arthur Rigge testified:

"*Q.* Now, Mr. Rigge, what was the condition of this boiler in reference to the fire front upon the morning of this day that you went to work with your brother Edward?

"*A.* The fire fronts were still on the car. * * * During the forenoon of the day he was injured my brother assisted in unloading the cars and building runways for wheeling in brick. That is part of the work usually done by masons to get started. It took the entire forenoon. I

don't remember what time we started work in the afternoon.

"*Q*. Who put up or attempted to put up the front to this boiler, the fire front?

"*A*. All of the men my father had employed. There was—I don't know the name of any of them outside of my brother and myself and my father. During the forenoon I myself assisted in unloading a car and getting material ready, working with my brother, not side by side, but working in the same nature of work. Several men came later, after noon, to help about the work. I don't know the time of day, shortly after dinner. * * *

"*A*. When we started to work right after dinner, the fire front was lying in front of the boilers. We had slid it over on two I-beams. All of the men in general did that.

"*Q*. These men that came after noon, you mean?

"*A*. No.

"*Q*. In the forenoon?

"*A*. We had that placed before dinner, my father, my brother, myself, and three other helpers. * * *

"*Q*. How many men were there working there at the time your brother was injured?

"*A*. Between 10 and 15, possibly—

"*Q*. Was there as many as 10, would you say, besides you and Edward?

"*A*. Yes; to the best of my knowledge, there was.

"*Q*. Where did you get those men?

"*A*. My father hired three of them.

"*Q*. Do you know who got the rest?

"*A*. No, sir. * * * I don't know whether the three men that were with us in the forenoon were a part of the ten that assisted in the afternoon. I do not remember of seeing them there at all. I had no occasion to attempt to talk with any of the men that came in the afternoon before my brother was injured, and did not hear my brother attempt to talk to them or give them any directions until that time he said to move the front out of there.

"*Q*. When you used the words, 'he said to move the front out a little,' are you using his words?

"*A*. I couldn't say exactly they were his words.

"*Q*. You said at the time he said to move the fronts. Did he say to move the front, or what did he say?

"*A*. He said words to that effect, and directly afterwards the front fell.

"*Q*. Was there anything else said between the time he used these words and the time the front fell by any one that you heard?

"*A*. No, sir; I didn't hear anything.

"*Q*. Can you give us any idea of how long it was after he said these words before these men let go, as you have testified to?

"*A*. They let go instantly, at that time.  *  *  *

"*Q*. How did they let go?

"*A*. I couldn't state how they let go, but the front came falling on him, no more than he said that, at the same instant.  *  *  *  You say those three men were not then the same men you had in the afternoon?

"*A*. They were still working there.

"*Q*. They were still with you in the afternoon?

"*A*. Yes. But they were not Italians. I couldn't say what nationality they were, but I should judge them to be German descent. I did not talk with them, and didn't have any conversation with them, and didn't give them any orders, and they didn't give me any orders. They were not Italians; that is my knowledge. They might have been Hungarians, and might have been Slavs. I worked with them all the morning, and don't know their nationality.

"*Q*. You don't know now and you didn't know then whether they could speak English or not?

"*A*. No, sir.  *  *  *

"*Q*. The only order you recollect was when your brother said to move it out a little?

"*A*. That is all I can recollect, or words to that effect.

"*Q*. And then somebody misunderstood the orders, because they tumbled it over upon him?

"*A*. Yes."

The foregoing is all the testimony in the case upon the subject of the ability of these laborers to understand English, and, aside from the answer of Edward to the question " Could they understand English," there is nothing justifying the conclusion that they could not, while there was considerable in the circumstances that indicates that they could. His answer was: " *I don't know*. I didn't know it till after. *I know they couldn't*

*now.*" There is nothing in the testimony to indicate that he ever saw them again. He was shown to have been unconscious when taken to the hospital, and that he was removed to Michigan immediately, starting the same afternoon that he was injured, and the inference is irresistible that his statement " I know they couldn't now " cannot be based upon personal knowledge, but must have been based upon hearsay, or upon a deduction from the circumstances, neither of which would have been competent evidence. That this was conceded to be all upon which the claim was based is shown by the colloquy:

"*The Court:* I don't see how you can say these men did not understand English. I don't see what evidence you have here.

"*Mr. Oxtoby:* Arthur Rigge testified they worked there in the morning, and, according to his testimony, there wasn't an order given in the morning, and in the afternoon no order was given, although they got it in position and until this particular order was given—this was the first order given—and it wasn't hardly an order at that, because the way he puts it. He said, ' We will move it over a little,' and then they dropped it upon him. He doesn't know now whether these men understood the language or not, or whether they got rattled and dropped it. That is just what happened.

"*The Court:* That's the way I understood Mr. Rigge's testimony. The affirmative is upon the plaintiff to show he did not understand it.

"*Mr. Hall:* We say the record is sufficient in view of what Mr. Edward Rigge testified to.

"*Mr. Oxtoby:* All right, take that. He goes further. [Reads testimony.]

"*Mr. Hall:* The presumption is, an Italian is an Italian, and does not understand—"

Not only does this record contain no testimony that these men could not understand English, but it is as consistent with the idea that they did understand that the front was to be moved forward, as that they did not. It is noticeable that, wherever the subject is mentioned in the dep-

osition, he says, "They shoved it over, let go of it."
And again:

"I started to lift on this and over it came.
"*Q.* They let go instead of holding on to it?
"*A.* Yes; or they shoved."

And again:

"The fire front fell because they shoved it over or let
go of it and it tipped over."

Arthur's explanation of his understanding is no stronger.

"*Q.* The only order you recollect was when your
brother said to move it out a little?
"*A.* That is all I can recollect, or words to that ef-
fect.
"*Q.* And then somebody misunderstood the orders, be-
cause they tumbled it over upon him?
"*A.* Yes."

It follows that the defendant has not been shown to
have been negligent in employing these laborers, and that
is sufficient to justify the direction of a verdict.  But we
are of the opinion that it should not be said that defend-
ant would have been negligent in employing foreigners to
perform this labor had he known that they did not under-
stand the English language.  Apparently they were
adults, who obtained their living through the performance
of common labor.  It would be a low order of intellect
that would not know that to let go of this plate would
necessarily result in its fall upon the plaintiff's intestate,
and an employer is not negligent for not anticipating that
a laborer of apparent ordinary intelligence would do such
a thing.  If it be conceded, however, that these men were
ignorant of the language, and that they did so unheard
of a thing as to all let go of a 1,200-pound plate standing
on edge, with the absolute certainty apparent to the most
commonplace intellect that it would fall upon their boss,
whether they understood or misunderstood the command,
such act was one of such extraordinary stupidity or mal-

ice that it is not to be ascribed solely to an ignorance of the language in which an order is given, and no employer is bound to anticipate it. Without intending to intimate that there may not be instances where the employment of men ignorant of the language used upon the work for which they are engaged is inconsistent with safety, and therefore negligent, we are of the opinion that so strict a rule as that relied on here should not be announced. Foreigners must be assumed to understand and appreciate the ordinary dangers of common labor, and to be the full equal in those regards of the English speaking race. Hundreds of thousands of them are performing common labor daily in this country, working in gangs in which co-operation is necessary. To say that an employer may not safely employ them unless he shall first ascertain that each has an English education would be discriminatory and unjust, and contrary to a wise public policy which invites such labor. Those who work with them can easily ascertain whether they comprehend the language, and can avoid any real or imaginary danger arising therefrom by refusing to work with them, and if, as counsel for the appellant contended, the law should presume that Italian laborers in this country are ignorant and do not understand our language, American laborers are as much bound to know and act upon it as the employers are, and it is much more consistent with justice to require this, than to say that families of foreigners shall starve through an industrial ostracism (which would naturally follow the imposition of this responsibility upon employers) until such time as the wage earners can become sufficiently conversant with the English language to instantly understand, and comprehend all orders that may be given to such foreigner or his gang. See *Lawrence* v. *Railway Co.*, 201 Mass. 489 (87 N. E. 898); *Date* v. *Glucose Co.*, 114 App. Div. (N. Y.) 789 (100 N. Y. Supp. 171), affirmed 190 N. Y. 510 (83 N. E. 1124); *Rahles* v. *Manufacturing Co.*, 137 Wis. 506 (118 N. W. 350, 119 N. W. 289, 23 L. R. A. [N. S.] 296).

It is unnecessary to discuss other questions. The judgment is affirmed.

MOORE, MCALVAY, and BROOKE, JJ., concurred with HOOKER, J.

BLAIR, J. I concur upon the ground that there was no evidence to sustain the charge of negligence relied upon, and, since this disposes of the case, I do not deem it prudent to consider the other questions.